# Richmond.

## Chesapeake and Ohio Railway Company v. Arrington.

### November 20, 1919.

1. MASTER AND SERVANT—*Federal Safety Appliance Act—Duty to Provide Automatic Couplings.*—Under the federal safety appliance act (U. S. Comp. St., sec. 8605 et seq.), there is an absolute and unqualified duty resting upon railway companies to provide coupling devices which will couple automatically by impact without the necessity of men going between the cars in order to make the coupling.

2. MASTER AND SERVANT—*Federal Safety Appliance Act—Coupling —Duty of Brakeman.*—Under the federal safety appliance act, it is as clearly the duty of a brakeman to refrain from going between an engine and a car in order to effect a coupling, if it is not necessary to do so, as it is the duty of the railroad company to furnish couplers which dispense with the necessity therefor.

3. EXPERT AND OPINION EVIDENCE—*Coupling Cars—Necessity to Go Between the Cars—Testimony of Plaintiff.*—The testimony of plaintiff in an action under the federal safety appliance act against a railroad company by a brakeman for an injury sustained while coupling cars, to the effect that it was necessary for him to go in between the engine and the car to effect the coupling, is admissible, for the inference that this was his opinion was the only possible inference, if they credited his statements, which could be drawn by the jury from the testimony which he had already given as to the existing facts. It is a misuse of language to call such a statement a mere opinion. It is more properly a conclusion drawn from alleged facts, sometimes called the collective facts rule.

4. COUPLING CARS—*Evidence—Failure of Coupler to Work Automatically.*—In an action under the federal safety appliance act by a brakeman against a railroad for injuries received in going between an engine and a car to effect a coupling, testimony as to the percentage of instances in which the coupler which was attached to the front of the engine would couple automatically by impact to a car without the necessity of the brakeman going between the engine and the car, is admissible.

5. COUPLING CARS—*Evidence—Failure of Coupler to Work Automatically.*—It was the duty of a railroad company under the federal safety appliance act to provide an engine which when properly operated and given a reasonable trial will couple with cars automatically by impact, and, while testimony tending to show the frequent failures of the coupler on a particular engine to meet the requirements of the act would not be conclusive against the company that it would not couple at a particular time, still it was persuasive and had a tendency to sustain the plaintiffs testimony to the effect that it was necessary to go between the engine and a car to effect a coupling.

6. MASTER AND SERVANT—*Coupling Cars—Federal Safety Appliance Act—Evidence.*—In an action under the federal safety appliance act by a brakeman for injuries received when he went between an engine and a car to make a coupling, evidence that the engine was a superheated engine, and that just after it had been in motion and was standing still it would frequently go forward very quickly when the brake was released, is admissible, where the plaintiff had testified that, when he went in between the car and the engine to open one of the knuckles with his hand and pulled the drawhead on the engine slightly towards him, the engine lunged forward suddenly—so very quickly as to catch his hand between the couplers before he could realize that it was in motion, and defendant's evidence was that the engine slowly drifted down to the point of contact.

7. MASTER AND SERVANT—*Coupling Cars—Evidence As to Coupling —Device.*—In an action under the federal safety appliance act by a brakeman for injuries received when he went between an engine and a car to make a coupling, evidence to the effect that sometimes the lever on the engine did not fully open the knuckle and it had to be pulled open, was admissible.

8. MASTER AND SERVANT—*Coupling Cars—Evidence as to the Coupling Device.*—In an action under the federal safety appliance act by a brakeman for injuries received when he went between an engine and a car to make a coupling, evidence that when the pin was in a certain position, which was indicated, it was impossible to open the knuckle by the use of the lever on the side of the car, that is, the lever that is placed there for the purpose of opening the knuckle without the necessity of going in between the cars, was admissible. The evidence objected to was not an opinion, but was a statement of fact, and was in contradiction of other evidence introduced by the defendant to the effect that the lever would open the knuckle even though the pin had not fallen.

9. COUPLING CARS—*Witnesses—Corroborative Testimony.*—In an action under the federal safety appliance act by a brakeman for injuries received while coupling cars, evidence as to the customary place for the man who gives the signals under such circumstances to stand—as to whether he generally stood on the south or north side of the track—is admissible, where the defendant had undertaken to discredit plaintiff's statement as to the place at which he stood, and this testimony tended to corroborate the statement of plaintiff.

10. APPEAL AND ERROR—*Harmless Error—Coupling Cars—Irrelevant Testimony.*—In an action under the federal safety appliance act by a brakeman injured in coupling cars, testimony by the plaintiff that he did not knowingly keep his hand on the coupler of the engine as it moved towards the car, was harmless, if erroneous.

11. MASTER AND SERVANT—*Coupling Cars—Side Play of Coupler.*— The side play of a coupler, according to a standard in general use on railroads, does not constitute a defect in the coupler, within the federal safety appliance Act.

12. COUPLING CARS—*Federal Safety Appliance Act—Side Play— Instructions.*—In an action under the federal safety appliance act by a brakeman for injuries received while coupling cars, an instruction that the side play of the coupler involved did not constitute a defect, unless that side play was greater than was necessary for the safe operation of the engine and cars, was not erroneous, construed in connection with the instructions granted to the plaintiff, although the language was not aptly chosen and instead of saying that it did not constitute a defect unless there was greater side play, or that the coupler or couplers were more out of line than was necessary for the safe operation of the engine and car, it would have been more accurate and appropriate to say, "than was necessary to bring about, when properly operated and given a fair trial, the automatic coupling of the car and engine by impact without the necessity of the plaintiff's going in between the ends of the engine and car to effect the coupling."

13. INSTRUCTIONS—*Partial View of the Case.*—An instruction which directs a finding for either the plaintiff or the defendant must cover all the material facts which the evidence proves or tends to prove, and an instruction which omits an essential view of the case is erroneous.

14. INSTRUCTIONS—*Partial View of the Case—Coupling Cars.*—In an action under the federal safety appliance act by a brakeman for injuries received while coupling cars, an instruction that if the jury believed that the car and the engine between

which plaintiff was hurt were each provided with standard automatic couplers which would couple automatically by impact and were in good working order, they should find for defendant, was erroneous, because it ignored plaintiff's evidence as to a defect in the coupler growing out of a large and unnecessary amount of lateral play of the drawhead tending to make it inoperative and to prevent coupling without the necessity of going between the cars.

15. MASTER AND SERVANT—*Coupling Cars—Federal Safety Appliance Act—Instructions.*—In an action under the federal safety appliance act, an instruction that if the jury believed that the engine of the defendant was not equipped with a coupler which would couple automatically by impact and which could be coupled to the car without the necessity of the plaintiff going between the car and the engine, and that this was the proximate cause of the injury to the plaintiff, they should find for the plaintiff, was not improper.

16. MASTER AND SERVANT—*Coupling Cars—Federal Safety Appliance Act.*—The federal safety appliance act is not complied with by merely furnishing couplings which will couple automatically by impact after they have been fixed and made ready to be coupled by employees going between the ends of the engine and car. Nor is the mere fact that the railway company provides couplers proper in their material and construction which are of standard make and are modeled and constructed so as to be capable of coupling by impact sufficient. The couplers must be so constructed and attached and kept so attached that they will when properly operated and given a reasonable trial actually and in fact couple automatically by impact without the necessity of the employees going between the ends of the engine and car to effect a coupling.

17. DAMAGES—*Personal Injuries—Double Damages.*—In an action for personal injuries, the jury were instructed that if they found for the plaintiff, they should allow him such sum as they believed from the evidence would compensate him reasonably for the injuries received, if any; and in estimating his damages, if any, they might take into consideration the mental and physical pain and suffering, if any, consequent upon the injuries received, the reasonable value of time already lost, if any, consequent upon his injuries; and, if they believed from the evidence that the said injuries are permanent and will wholly or partially disable him to labor and earn money in the future, then they might, in addition to the above, find such sum as would, if paid now, be a fair compensation for his diminished capacity, if any, to labor and earn wages in the future,

and in this connection they may take into consideration the probable duration of the plaintiff's life under all the proof in the case.

*Held:* Not erroneous as authorizing the jury to award double damages.

18. DAMAGES—*Personal Injuries—"Wholly Disable."*—In an action for damages for the loss of an arm, an instruction on the measure of damages should contain no reference to injuries which would wholly disable the plaintiff, because while the loss of a right hand and forearm is a grievous misfortune, it cannot be said wholly to disable one.

19. NEW TRIALS—*Verdict Contrary to the Law and Evidence—Federal Safety Appliance Act—Coupling Cars.*—In an action under the federal safety appliance act by a brakeman to recover for injuries while coupling cars, plaintiff testified to facts from which the jury might have inferred that it was necessary for him to go between the engine and the car in order to effect the coupling, while the conductor, who was in a position equally advantageous, testified that it was unnecessary, and was sustained by the significant physical facts that the apparatus operated successfully both before and after the accident.

*Held:* That the question was one of fact about which reasonable men might fairly differ, and hence was properly submitted to the jury.

20. NEW TRIALS—*Excessive or Inadequate Damages—General Rule.*—While the law wisely leaves the assessment of damages, as a rule, to juries, nevertheless judges have the power and are clearly charged with the duty of setting aside verdicts, where the damages are either so excessive or so small as to shock the conscience and to create the impression that the jury has been influenced by passion or prejudice, or has in some way misconceived or misinterpreted the facts or the law which should guide them to a just conclusion.

21. NEW TRIALS—*Excessive Damages—Loss of An Arm.*—In an action for damages for personal injuries, plaintiff was a man in good health, 42 years of age, with a life expectancy of 26 years. At the time of the accident he was making $120 a month, and at the time of the trial, if he had continued in the same employment as a brakeman, his wages would have been $150 per month. He had successfully stood his examination and expected soon to receive the pay of a conductor. He lost his right forearm, which was severed about four inches below the elbow by being crushed between the coupler of the car and the engine. He had apparently recovered from his wound and the immediate shock of his injury.

*Held:* That a verdict of $30,000 was excessive.

22. DAMAGES—*Excessive or Inadequate Damages—Comparison of Verdicts.*—Where the amount of a verdict is attacked because it is so unusual, it is proper to make comparisons with the verdicts which other juries have found in other cases for similar injuries; for, while each case must be determined by its own facts, it is nevertheless true that the verdicts of other juries, which have been approved by the courts, represent the common or average judgment of mankind as to the proper recovery in such cases. Of course, these verdicts show a very wide difference of opinion, growing out of the circumstances of the different cases.

23. DAMAGES—*Personal Injuries—Earnings.*—In an action for damages for personal injuries, a verdict based upon the theory that plaintiff was entitled to a sum which, properly invested, would yield an amount annually equal to his past or expectant wages during his life, leaving the principal undiminished for his estate at his death, and without considering the fact that his earning capacity, while lessened, was not wholly destroyed, is clearly erroneous.

24. DAMAGES—*Personal Injuries—Earning Power.*—In estimating the damages of plaintiff, a brakeman 42 years old, for personal injuries, the jury should have taken into consideration plaintiff's age, and that his earnings from manual labor would naturally diminish because of his advancing years long before he lived out his life expectancy.

Error to a judgment of the Circuit Court of Bath county, in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*J. M. Perry,* for the plaintiff in error.

*O. B. Harvey, M. J. Putnam* and *H. H. Byrd,* for the defendant in error.

PRENTIS, J., delivered the opinion of the court.

The plaintiff in error, hereinafter called the company, complains of a verdict and judgment in favor of L. N. Ar-

rington, hereinafter called the plaintiff, in an action for personal injury. The plaintiff was a brakeman employed by the company, had his right hand and forearm cut off four inches below the elbow, and the judgment is for $30,000, with interest and costs.

At the conclusion of the evidence the plaintiff abandoned the first four counts of his declaration and relied solely upon the fifth count, which charges the defendant with violation of the federal safety appliance act (U. S. Comp. St. § 8605 *et seq.*) in that the defendant did not provide, maintain and keep in repair couplers on its engines and cars, which would couple automatically by impact, and which could be coupled successfully without the plaintiff going in between the said engines and cars to make the coupling, and that by reason of said failure it became and was necessary for the plaintiff, in order to make the coupling, to go between the front of the engine and the car and to arrange and adjust the couplers on said engine and car so that they would couple, and that while so engaged the engine moved ahead a few feet and caught and crushed the plaintiff's hand and forearm.

[1] The merits of the case lie within very narrow limits, because it has long been definitely settled that under the safety appliance act there is an absolute and unqualified duty resting upon railway companies to provide coupling devices which will couple automatically by impact without the necessity of men going between the cars in order to make the coupling. *St. Louis, I. M. & S. R. Co.* v. *Taylor,* 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061; *C. B. & Q. Ry. Co.* v. *U. S.,* 220 U. S. 559, 31 Sup. Ct. 612, 55 L. Ed. 582; *Delk* v. *St. L. & S. F. R. Co.,* 220 U. S. 580, 31 Sup. Ct. 617, 55 L. Ed. 590; *T. & P. Ry. Co.* v. *Rigsby,* 241 U. S. 33, 36 Sup. Ct. 482, 60 L. Ed. 874; *L. & N. R. Co.* v. *Layton,* 243 U. S. 617, 37 Sup. Ct. 456, 61 L. Ed. 931; *San*

*Antonio, A. & A. Pass. Ry. Co.* v. *Wagner,* 241 U. S. 476, 36 Sup. Ct. 626, 60 L. Ed. 1110; *Spokane & I. R. R. Co.* v. *Campbell,* 241 U. S. 497, 36 Sup. Ct. 683, 60 L. Ed. 1125; *L. & J. B. Co.* v. *U. S.,* 249 U. S. 534, 39 Sup. Ct., 355, 63 L. Ed. 757; *C., R. I. & P. Ry. Co.* v. *Brown,* 229 U. St. 317, 33 Sup. Ct. 840, 57 L. Ed. 1204; *Virginian Ry Co.* v. *Andrews,* 118 Va. 486, 87 S. E. 577.

[2] The question of fact, then, to be determined is whether or not, under the existing circumstances, it was necessary for the plaintiff to go between the engine and the car in order to effect the coupling. It was just as clearly his duty to refrain from doing so unless the necessity therefor existed as it was the duty of the company to furnish couplers which dispense with the necessity therefor.

Inasmuch as under our view of the case it is necessary to reverse the judgment and remand the case for a new trial, it is proper to notice numerous assignments of error so as to avoid similar controversies when the case is again tried.

[3] 1. It is complained that the trial court erred in refusing to exclude the testimony of the plaintiff to the effect that it was necessary for him to go in between the engine and the car. It is claimed that this is an opinion expressed upon a pivotal question which is to be decided by the jury, and is therefore, illegal and incompetent. Several Virginia cases as well as cases from other jurisdictions are cited in support of this view. The question has been much discussed, and it is impossible to reconcile the decisions. Here the very foundation of this action is the plaintiff's contention that it was necessary for him to go into the place of danger. While true that the jury had to determine this very point, it is also true that the only inference which can be drawn from every other part of his testimony and the facts stated by him to exist is that he

thought that such necessity existed. From these facts, which were few and simple, of course it was the ultimate province of the jury (and not of the witness) to draw the proper inference, either in his favor or against him, and his conclusion that the necessity existed cannot be substituted for the judgment of the jury. It is a misuse of language, however, to call such a statement a mere opinion. It is more properly a conclusion drawn from alleged facts, sometimes called the collective facts rule. 11 R. C. L., sec. 6, p. 571, sec. 52, p. 633. It would serve no good purpose to attempt to follow the refined reasoning of the various courts upon this question, for the decisions are in hopeless conflict. This, however, is pertinent from *New York, etc., R. Co.* v. *Wilson's Adm'r,* 109 Va. 754, 64 S. E. 1060: "A witness who was present and acquainted with the existing conditions may give an opinion as to how far under these conditions a signal given by a red lantern could have been observed on the occasion in question. This is not expert evidence, but a matter of common experience, the value of which is to be determined by the jury, who have the witness before them and can judge of the value of his opinions."

In *Norfolk, etc., Ry. Co.* v. *Tanner,* 100 Va. 379, 41 S. E. 721, it is held that experienced railroad trainmen, such as section hands, foremen in shops and conductors, may testify as to the speed of trains. The weight of such evidence is to be determined by the jury, taking into consideration the character, intelligence and experience of the witnesses. Of this there is no question. Note 34 L. R. A. (N. S.) 791.

In *San Antonio A. &c. R. Co.* v. *Wagner, supra,* the statement of the plaintiff, a brakeman with eight years' experience, that a coupler was out of order, was held admissible as the opinion of an expert acquainted with the operation

of couplers. The cases of *C. & O. Ry. Co.* v. *Mathews*, 114 Va. 173, 76 S. E. 288, and *Hot Springs Co.* v. *Revercomb*, 110 Va. 240, 65 S. E. 557, illustrate this rule.

A question precisely similar to that here involved is decided in the case of *Wabash Railroad Co.* v. *United States*, 168 Fed. 5, 93 C. C. A. 397, where a trainman was asked, "In the condition in which that coupler was on the end of the car at that time, what was necessary in order to operate the coupler?" He answered that it was necessary for a man to go in between the ends of the cars and take the part of the chain that was left with the coupler to operate that coupler; and the court held that an expert trainman may be asked as to the condition of a car coupler in question, and as to what was necessary in order to operate that coupler, as the mode of operation of automatic coupling mechanisms and the effect of various conditions thereof are proper subjects for expert testimony.

Mr. Wigmore, in discussing the future of the opinion rule, says this: "The opinion rule day by day exhibits its unpractical subtlety and its useless refinement of logic. Under this rule we accomplish little by enforcing it, and we should do no harm if we dispensed with it. We accomplish little, because, from the side on which the witness appears and from the form of the question, his answer, *i. e.*, his opinion, may often be inferred. We should do no harm, because, even when the final opinion or inference is admitted, the inference amounts in force usually to nothing unless it appears to be solidly based on satisfactory data, the existence and quality of which we can always bring out, if desirable, on cross-examination. Add to this that, under the present illiberal application of the rule, and the practice as to new trials, a single erroneous ruling upon the single trifling answer of one witness out of a dozen or more in a trial occupying a day may overturn

the whole result and cause a 'double expense of time, money and effort; and we perceive the absurdly unjust effects of the rule. Add, finally, the utter impossibility of a consistent application of the rule, and the consequent uncertainty of the law, and we understand how much more it makes for injustice rather than justice. It has done more than any one rule of procedure to reduce our litigation towards a state of legalized gambling." He suggests a radical remedy, which is worthy of consideration by the legislature; that is, a statute in the following form: "An inference or opinion may always be stated to the tribunal by a witness experientially qualified to form it, provided either that he has had adequate personal observation of the matter in question, or that he has the data hypothetically, stated to him in court; and it is immaterial whether or not the data are capable of being so stated by him or by others that the tribunal is equally capable of drawing the inference, and whether or not the data are stated by him before stating his inference and whether or not the inference involves the very subject of the issue, or one of the issues, before the tribunal; provided that the trial judge may in any case in his discretion exclude testimony involving an inference from data observed, or any other superfluous testimony, whenever in his judgment such testimony is merely cumulative or of undue personal weight, and is therefore undesirable," 3 Wigmore on Evidence, sec. 1929.

It is clear to us in this case that there was no error in permitting the plaintiff to state that the necessity of going between the cars existed, for the inference that this was his opinion was the only possible inference, if they credited his statements, which could be drawn by the jury from the testimony which he had already given as to the existing facts.

[4, 5] 2. It is claimed that the court erred in permitting several witnesses to testify as to the percentage of instances in which the coupler which was attached to the front of the engine here involved, No. 944, would couple automatically by impact to a car without the necessity of the brakeman going between the engine and the car. This testimony was to the effect that the percentage of cases in which the coupling would fail was very large. The evidence is said to be irrelevant and immaterial, and to be objectionable as mere opinions of the witnesses. The duty of the railway company was to provide an engine which when properly operated and given a reasonable trial would couple with cars automatically by impact, and while testimony tending to show the frequent failures of the coupler on this engine to meet the requirements of the act would not be conclusive against the company that it would not couple at this particular time, still it was persuasive and had a tendency to sustain the plaintiff's testimony that such necessity existed on this occasion. While the plaintiff's case depends upon whether the necessity existed at the very time of the accident, and he must show to the satisfaction of the jury that such necessity actually then existed, he was nevertheless entitled in this case, in which the company's witnesses testified that the necessity did not exist at that time, to show the frequent failure of the equipment to operate—not as proving his case, but only as tending to aid the jury in deciding the conflicts in the evidence. The company was contending that if the coupler had been given a fair trial it would have coupled automatically then, and this testimony tended to sustain the plaintiff by showing the past experience of those who had seen it in operation. We think the evidence was properly admitted.

[6] It is alleged that it was error to allow certain witnesses to testify that the engine, No. 944, was a super-

heated engine, and that just after it has been in motion and is standing still it will frequently go forward very quickly when the brake is released. The plaintiff had testified that when he went in between the car and the engine to open one of the knuckles with his hand and pulled the drawhead on the engine slightly towards him, the engine lunged forward suddenly—so very quickly as to catch his hand between the couplers before he could realize that it was in motion; whereas the defendant's witnesses testified that upon the signal to the engineer, the engine slowly drifted down to the point of contact with the car. This testimony, which is objected to and criticised, tended to sustain the plaintiff's testimony as well as to show the cause of the accident, and was, therefore, in our opinion, clearly admissible. *C. & O. Ry. Co.* v. *Meadows,* 119 Va. 40, 89 S. E. 244.

[7] The testimony of the witness, Sullender, to the effect that sometimes the lever on the engine 944 does not fully open the knuckle and it has to be pulled open, is also admissible for the same reasons.

[8] 3. The witness, Showalter, was allowed to testify that when the pin was in a certain position, which was indicated, it was impossible to open the knuckle by the use of the lever on the side of the car—that is, the lever that is placed there for the purpose of opening the knuckle without the necessity of going in between the cars. It is objected that the testimony was an opinion and was incompetent and irrelevant, because the witness did not know anything about the condition of the coupler on the day of the accident. This objection is untenable because the evidence does not purport to be a statement of the then existing condition of the coupler. It, on the contrary, is a statement as to its mechanical operation. The plaintiff had testified that the pin in the coupler failed to fall when

the engine and cars were brought together, and that when the pin fails to fall thereafter no control can be exercised upon the coupling device by pulling the lever at the side of the car, but it is then necessary to go in between the cars to adjust the couplers by hand, and this witness, Showalter, was familiar with the coupling apparatus on engine No. 944 and knew its mechanism. The evidence objected to was not an opinion, but was a statement of fact, the truth or falsity of which could be easily settled by an experiment with the coupler actually in use. The evidence was simply a contradiction of certain other evidence introduced by the company to the ei$ ⸍ that the lever would open the knuckle even though the p⎮ had not fallen.

[9] It is objected that a witn⎮ ⸴ for the company, (McCambridge) was allowed to testi⎮ as to the customary place for the man who gives the si⸴nals under circumstances to stand—as to whether he generally stood on the south or north side of the track. The company had undertaken to discredit Arrington's statement as to the place at which he stood, and introduced testimony designed to show that there was a deep ditch at that place, making it physically impossible for Arrington to stand where he said he did, and this testimony tended to corroborate the plaintiff's testimony. It was clearly admissible.

[10] 5. It is objected that the plaintiff was allowed to testify that he did not knowingly keep his hand on the coupler of the engine as it moved towards the car. The objection is that the evidence is immaterial and irrelevant. Even if this be true, no prejudice is shown, and therefore the assignment is without merit.

[11, 12] 6. The company asked the court to give the jury an instruction marked "D", which reads thus: "The court instructs the jury that side play in a coupler, according to a standard in general and accepted use on railroads,

does not constitute a defect in a coupler, unless the jury further believe from the evidence that in one or both of the couplers involved in this case there was greater side play, or that the coupler or couplers were more out of line than was necessary for the safe operation of engine and car."

One of the points in controversy in the case is as to the amount of lateral or side play the coupler attached to the front of the engine had, and whether this prevented the coupling by impact. The plaintiff had testified that it had a lateral movement of twelve inches, and that as it appeared to be out of line he changed its position slightly when he went in to open the knuckle with his hand, and had also introduced other witnesses who testified as to this alleged excessive lateral movement. To counteract the effect of this testimony the company introduced evidence tending to show that without lateral play in the couplers it is impossible to keep the couplers in alignment on a curve; that the practical result of their misalignment was that frequently the couplers were broken, the pocket or entension piece was broken off, the bolts attaching it to the beam of the locomotive were sometimes sheared off, the locomotive was derailed on curves, flanges were broken, and the like; that the amount of lateral play in locomotive couplings on the various railroads throughout the United States is according to a fixed standard, which has been arrived at after years of experiment by actual practical experience; that the amount of side play of the locomotive coupler here involved was only six inches and was of the ascertained standard; that such movement is absolutely necessary to meet railroad conditions on the average railroad in the United States and on its road on such an engine; and that this coupler operated successfully by impact a short while before as well as just after the accident. So that one of the

vital controversies in the case was as to whether the lateral movement of the coupler on the engine constituted a defect such as would prevent the coupling by impact without the necessity of the men going in between the cars. The plaintiff to meet this situation had gotten three instructions presenting its view of the case, to the effect that it was the absolute duty of the company to provide and maintain couplers which would couple automatically by impact without making it necessary for him to go between the end of the engine and the car, and that the law was not complied with by merely furnishing couplings which would couple automatically by impact after they had been fixed and made ready to couple by his going in between the engine and the car; and that the mere fact that the company provides couplers proper in their material and construction, which are of standard make, is not sufficient; that they must be so constructed and attached and kept attached that when properly operated and given a reasonable trial they will couple by impact without the necessity of the employee's going in between the engine and the car to effect the coupling. Now this instruction "D" which was refused was intended to present the company's view of the case as to the lateral movement of the coupler on the engine, and to avoid the effect of the plaintiff's testimony that it had an excessive lateral movement of twelve inches, and was therefore defective. The criticism of the instruction by the plaintiff is that it is erroneous in that it makes the liability of the defendant depend upon the exercise of reasonable care in equipping and maintaining the safety device; but we do not think that this is true, and certainly this was fully taken care of by the instructions which the court gave at the instance of the plaintiff. The first clause of the instruction is merely to the effect that side play, according to a standard and

27

generally accepted use on all railroads, does not constitute a defect. This is obviously true, for railroads cannot be built upon straight lines, and when rounding curves some lateral play is absolutely necessary. Mr. Justice Holmes, in *Atlantic City Railroad Co.* v. *Parker*, 242 U. S. 59, 37 Sup. Ct. 70, 61 L. Ed. 152 says: "Some lateral play must be allowed to drawheads." This is all that the first clause of the instruction states. The second clause states that the side play of the coupler here involved did not constitute a defect unless that side play was greater than was necessary for the safe operation of the engine and cars, and construed in connection with the instructions which the court gave on behalf of the plaintiff, we think it does not bear the construction which the plaintiff puts upon it. The language is not aptly chosen, it is true, and instead of saying that it did not constitute a defect unless there was greater side play, or that the coupler or couplers were more out of line, than was necessary for the safe operation of the engine and car, it would have been more accurate and appropriate to say, "than was necessary to bring about, when properly operated and given a fair trial, the automatic coupling of the car and engine by impact without the necessity of the plaintiff's going in between the ends of the engine and car to effect the coupling." This, however, when considered in connection with the instructions granted to the plaintiff, is clearly implied in the language which was actually used. The safe operation of the engine and car implies safety for the employees, the proper coupling by impact and the contention of the plaintiff that it is the absolute duty of the company to provide the couplers which are required by the safety appliance act. While as indicated, the instruction is worthy of criticism, we are nevertheless of the opinion that, fairly construed, it only undertook to place before the jury the contention of

the company that there was no defect in the coupler because of the alleged side play, and that if it had been given a fair trial the engine and the car would have coupled on the next impact, and thus that the side play of the coupler created no necessity for the plaintiff to go into the place of danger. As the case went to the jury, the company was denied the benefit of its evidence to the effect that there was no defect by reason of the side play of the coupler on the engine, and that its lateral movement which was necessary for safety was not sufficiently great to necessitate the plaintiff's going in between the engine and the car.

[13, 14] 7. The court refused to give the following instruction "C" which the company asked for: "The court instructs the jury that if they believe from the evidence that the car and engine between which Arrington was hurt were each provided with standard automatic couplers which would couple automatically by impact when the knuckles were open and were provided with levers by which the knuckles could be thrown open without going between the cars, and that these couplers were in good working order, and that there is no coupler known which will couple by impact while the knuckles are closed, or one closed and the other partly closed, then the jury should find their verdict for the defendant."

This instruction is substantially identical with the instruction recently approved by the United States Circuit Court of Appeals for the Fourth Circuit in the case of *C. & O. Ry.* v. *Charlton*, 247 Fed. 37, 159 C. C. A. 252. It was objected to by the plaintiff upon the well settled ground that an instruction which directs a finding for either the plaintiff or the defendant must cover all the material facts which the evidence proves or tends to prove, and that an instruction which omits an essential view of

the case is erroneous. *American Locomotive Co.* v. *Whitlock,* 109 Va. 238, 63 S. E. 991; *Southern Ry. Co.* v. *Baptist,* 114 Va. 723, 77 S. E. 477; *Pocahontas, etc., Co.* v. *Hariston,* 117 Va. 118, 83 S. E. 1041; *Richmond* v. *McCormack,* 120 Va. 559, 91 S. E. 767.

While true that the instruction was approved in the case of *C. & O. Ry. Co.* v. *Charlton, supra,* in that case there was no evidence as to a defect in the coupler growing out of a large and unnecessary amount of lateral play of the drawhead tending to make it inoperative and to prevent coupling without the necessity of going between the cars. In the case in judgment, the plaintiff had testified that the coupler on the engine had six inches of lateral movement on each side, and that it was out of alignment just before the accident; that the lift lever would not control this lateral movement of the coupler, and that when he went in between the car and the engine to open the knuckle he also slightly moved the drawhead laterally, his evident purpose being to make sure that upon the next impact the coupling apparatus would operate. As the instruction omits all reference to this testimony, it was properly refused. It would have been misleading to the jury to have withdrawn that testimony from their consideration as immaterial and irrelevant. It would be a correct instruction in a proper case, and will be a correct instruction in this case when modified so as to include a proper reference to the alleged defect in the operation of the coupler just before the accident caused by the alleged excessive lateral movement. As presented, it was properly refused.

[15, 16] 8. The company excepted to instructions 2 and 3, given on behalf of the plaintiff. They read as follows:

"No. 2. The court instructs the jury that if they believe from the evidence that the engine of the defendant was

not equipped with a coupler which would couple automatically by impact and which could be coupled to the car without the necessity of the plaintiff going between the ends of the engine and the car to make the coupling at the time of the accident, and that the failure to have the engine so equipped proximately caused the injury to the plaintiff, they should find for the plaintiff, unless they believe that the plaintiff was guilty of contributory negligence.

"No. 3. The court instructs the jury that the law is not complied with by merely furnishing couplings which will couple automatically by impact after they have been fixed and made ready to be coupled by employees going between the ends of the engine and car. Nor·is the mere fact that the railway company provides couplers proper in their material and construction which are of standard make and are modelled and constructed so as to be capable of coupling·by impact sufficient. The couplers must be so constructed and attached and kept so attached that they will when properly operated and given a reasonable trial actually and in fact couple automatically by impact without the necessity of the employees going between the ends of the engine and car to effect a coupling.

We do not think it necessary to prolong this opinion by discussing the objections which are made to these instructions. We deem it sufficient to say that the decisions of the Supreme Court of the United States cited in the previous part of this opinion fully sustain the court in granting these two instructions.

The company's view of the case was presented to the jury by the instructions "A," "B" and "E," given at its instance. They read thus:

"A. The court instructs the jury that it was the duty of the plaintiff while coupling cars to exercise such care for his own safety as a reasonably prudent man would

exercise under the circumstances, and if the jury believes from the evidence that the plaintiff, Arrington, knew or could have known, by exercise of such care as a reasonably prudent man would exercise under the circumstances, that the engine was moving towards the car to which it was to be coupled and that the couplers would strike together, and yet kept his hand on the coupler until it was caught, then the plaintiff was guilty of contributory negligence and should not recover anything in this case.

"B. The court instructs the jury that the happening of the accident to the plaintiff, Arrington, creates no presumption of wrong against the defendant. The burden is upon the plaintiff to prove to the satisfaction of the jury, and by the greater weight of the evidence, that it was necessary for the plaintiff to go between the car and engine in order to make the coupling, and that it was thus necessary because the couplers, after a fair and reasonable trial, were such as would not couple automatically by impact, or because one or both of the couplers were out of repair. And unless the jury believes from the evidence that the plaintiff, Arrington, has done this, the jury should bring in a verdict for the defendant.

"E. The court instructs the jury that if they believe from the evidence that the car and engine between which Arrington, the plaintiff, was injured each was provided with couplers which upon a fair and reasonable trial would couple automatically by impact without the necessity of Arrington going between the cars for the purpose of coupling them at the time he was hurt, and that the couplers were in good order and repair, then there is no legal liability upon the defendant and the jury should find a verdict for the defendant."

[17, 18] There is also an exception to instruction 5, given on behalf of the plaintiff, which reads thus:

"The court instructs the jury that if under all the evidence and instructions of the court they should find for the plaintiff, they should allow him such sum as they believe from the evidence will compensate him reasonably for the injuries received, if any; and in estimating his damages, if any, may take into consideration the mental and physical pain and suffering, if any, consequent upon the injuries received, the reasonable value of time already lost, if any, consequent upon the injuries; and if they believe from the evidence that said injuries are permanent and will wholly or partially disable him to labor and earn money in the future, then they may, in addition to the above, find such sum as will, if paid now, be a fair compensation for his diminished capacity, if any, to labor and earn wages in the future, and in this connection they may take into consideration the probable duration of the plaintiff's life under all the proof in the case."

The objection is that the instruction allows the jury to give double damages, claiming that the first clause of the instruction permits the jury to compensate the plaintiff for the injuries received, and that the latter clause allows them "in addition to the above, (to) find such sum as will, if paid now, be a fair compensation for his diminished capacity, if any, to labor and earn wages in the future." This instruction is supported by the very great weight of authority, and one substantially similar is highly commended in a note in Shearman & Redfield on Negligence (3d ed.), section 760, p. 2009. Fairly construed, the instruction in the first clause allows the jury to find compensatory damages, and the residue of the instruction simply directs how they may estimate the constituent elements of such compensatory damages. The language, that they may "in addition to the above," does not refer to the first clause relating to the compensatory damages as a whole,

but only refers to the constituent elements which together constitute the compensatory damages which, if the plaintiff is entitled to recover, the jury may allow. In this particular case, there should have been no reference in the instruction to injuries which would wholly disable the plaintiff, because while the loss of a right hand and forearm is a grievous misfortune, most serious in its consequences, it cannot be said wholly to disable one. Many one-armed men are able to take creditable places in the business world, and to compete in the conflicts of life, successfully, with those who have not been so unfortunate.

The instruction does not authorize the jury to award double damages, and there is ample authority to sustain it, considered as a whole, so that no further discussion of it is deemed necessary. *Vicksburg, etc., R. Co.* v. *Putnam,* 118 U. S. 554, 7 Sup. Ct. 1, 30 L. Ed. 257; *C. & O. Ry. Co* v. *Kelly,* 241 U. S. 485, 36 Sup. Ct. 630, 60 L. Ed. 1122, L. R. A. 1917F., 367; *C. & O. Ry. Co.* v. *Swartz,* 115 Va. 723, 80 S. E. 568; *C. & O. Ry. Co.* v. *Carnahan,* 118 Va. 46, 86 S. E. 863; *C. & O. Ry. Co.* v. *Meadows,* 119 Va. 33, 89 S. E. 244.

[19] 9. The company assigns error, that the trial court refused to set aside the verdict as contrary to the law and the evidence. The plaintiff testified to facts from which the jury might have inferred that it was necessary for him to go between the engine and car in order to effect the coupling, while the conductor who was in a position equally advantageous, testified that it was unnecessary, and he is sustained by the significant physical facts that the apparatus operated successfully both before and after the accident. Thus the question was one of fact about which reasonable men might fairly differ, and hence was properly submitted to the jury; therefore, the exception on this ground is without merit.

The company also claims that the verdict and judgment should have been set aside because the damages, $30,000, are excessive. No question is ever presented, either to a trial court or to an appellate court, more difficult of determination than this, and in almost every notable case, however decided, subjects the courts to the unjust and intemperate criticisms of those whose judgments are controlled by their own selfish interests. Such criticisms, whether they emanate from those who assume to speak either for organized capital or organized labor, for the most part are neither instructive nor helpful, for they merely darken counsel "by words without knowledge." The question, then, should be approached by the courts with the greatest circumspection and with the keenest sense of responsibility for the due administration of justice.

[20] The law wisely leaves the assessment of damages, as a rule, to juries, with the concession that there are no scales in which to weigh human suffering, and no measure by which pecuniary compensation for personal injuries can be accurately ascertained. Nevertheless, it is an ancient and accepted doctrine of the common law, that judges have the power and are clearly charged with the duty of setting aside verdicts where the damages are either so excessive or so small as to shock the conscience and to create the impression that the jury has been influenced by passion or prejudice, or has in some way misconceived or misinterpreted the facts or the law which should guide them to a just conclusion. *Phillips* v. *London & S. W. Ry. Co.,* 8 Eng. Rul. Cas. 447, note, 5 Q. B. D. 78, 41 L. T. 121, 28 W. R. 10.

[21] The plaintiff here was a man in good health, forty-two years of age, with a life expectancy of twenty-six years. At the time of the accident he was making $120 a month, and at the time of the trial, if he had

continued in the same employment as a brakeman, his wages would have been $150 per month. He had successfully stood his examination and expected soon to receive the pay of a conductor. He lost his right forearm, which was severed about four inches below the elbow by being crushed between the coupler of the car and the engine. He has apparently recovered from his wound and the immediate shock of his injury—at least, this is the presumption for there is no evidence to the contrary.

[22] In such a case as this, where the amount of the verdict is attacked because it is so unusual, it is proper to make comparisons with the verdicts which other juries have found in other cases for similar injuries; for while each case must be determined by its own facts, it is nevertheless true that the verdicts of other juries which have been approved by the courts, represent the common or average judgment of mankind as to the proper recovery in such cases. Of course, these verdicts show a very wide difference of opinion, growing out of the circumstances of the different cases. There is a collection of comparatively recent cases in the 17 Corpus Juris, at page 1102. It is there shown that out of nine cases, for the loss of an entire arm, verdicts ranging from a minimum of $6,000 to a maximum of $25,000, including two for $25,000, the average is $16,277, and all of these verdicts were held to be excessive and were either set aside or materially reduced. These cases come from Michigan, Montana, Illinois, Pennsylvania, New York, Kentucky, Missouri and Iowa, thus covering many sections of the country. Upon the same page of 17 Corpus Juris, there are a large number of cases cited, in which the damages for similar injuries were held not to be excessive. Twenty-three of these verdicts (including that in *N. & W. Ry. Co.* v. *Ampey*, 93 Va. 137, 25 S. E. 226, where the verdict was for $3,500) are below $10,000. Omitting them from the calculation, and taking only the

other twenty-six cases in which the verdicts are far above the average amount, notably one for $32,500, the next highest being for $17,500, the average of these verdicts held not excessive appears to be $13,003.

The case in which the verdict of $32,500 was sustained is *Roeder* v. *Erie Railroad Co.* (Sup.) 164 N. Y. S. 167. In that case the arm of the plaintiff was crushed off at the shoulder. His age and position are not stated, but it is said that but for the injury he would have been able to earn during the rest of his life the sum of $44,000, estimated on the basis of his wages at the time he was hurt. It is also said that in determining whether a verdict for personal injury is excessive, it is important to determine the present purchasing power of money. So far as we are advised, this case stands alone, and no verdict approaching this amount for such an injury has ever been sustained by any other court.

In all these cases there was the absolute loss of the arm. In this case, the plaintiff lost his forearm, and these cases are therefore pertinent: *Knock* v. *Tonopah, etc., R. Co.,* 38 Nev. 143, 145 Pac. 939, L. R. A. 1915 F, 3, in which a plaintiff twenty-nine years of age with eleven years experience in railroading in various positions, and earning on an average of $170 a month as conductor and brakeman. There was a verdict for $25,500 for the loss of his right forearm, which necessitated an amputation below the elbow. In that case there are a number of citations relating to damages in such cases. The court reduced the verdict to $15,000, being of opinion that it was excessive. *Bradbury* v. *Chicago, etc., R. Co.,* 149 Ia. 51, 128 N. W. 1, 40 L. R. A. (N. S.) 684, in which a brakeman twenty-four years old, earning $80 to $85 per month with a life expectancy of thirty-nine and one-half years, was awarded $15.000 by the jury. His right arm had been amputated about two inches below the elbow. In that case the court reduced the verdict to $12,000.

[23] There are notes in L. R. A. 1915, p, 56, Am. & Eng. Ann. Cas., Vol. 16, p. 20, and in Am. & Eng. Ann. Cas. 1913A, p. 1371, from which a comparison can be made of many cases from every section of the country, and from such a comparison it is apparent that this judgment is excessive in amount. The recent workmen's compensation act in Virginia provides for a maximum allowance of $4,000 for personal injury, and while there is no statute imposing any limitation upon the jury in this case, the fact that the legislature of Virginia has made this provision for injured workmen is at least some indication of the common judgment for the average case. This verdict is so large by comparison with other verdicts for similar injuries that it seems fairly manifest that the jury must have misunderstood the instruction and misconceived the rules of law by which they should have been guided. They were authorized, if they believed the plaintiff was entitled to recover, to allow such a sum as would fairly compensate him for his physical pain, and also such a sum as if paid now would be a fair compensation to the plaintiff for diminished capacity to labor and earn wages in the future, and in that connection they were authorized to take into consideration the probable duration of the plaintiff's life. The amount allowed, $30,000, if invested at six per cent. interest, would yield $1,800 a year, which was more than the amount the plaintiff was earning at the time he was injured, and would have supplied him with that income during his life and left him with an estate of $30,000 at his death, which is greater in amount than the average man of industry and intelligence accumulates in a lifetime. If they made this allowance upon the theory that he was entitled to a sum which properly invested would yield him an amount annually equal to his past or expectant wages during his life, leaving the principal undiminished for his estate at his death, and without con-

sidering the fact that his earning capacity, while lessened, was not wholly destroyed, then according to all the authorities they erred.

In *C. & O. Ry. Co.* v. *Kelly, supra,* this is said: "So far as a verdict is based upon the deprivation of future benefits, it will afford more than compensation if it be made up by aggregating the benefits without taking account of the earning power of the money that is presently to be awarded. It is self-evident that a given sum of money in hand is worth more than the like sum of money payable in the future. Ordinarily a person seeking to recover damages for the wrongful act of another must do that which a reasonable man would do under the circumstances to limit the amount of the damages. *Wicker* v. *Hoppock,* 6 Wall. 94, 99, 18 L. Ed. 752, 753; *The Baltimore,* 8 Wall. 377, 387, 19 L. Ed. 463, 465; *United States* v. *Smith,* 94 U. S. 214, 218, 24 L. Ed. 115; *Warren* v. *Stoddart,* 105 U. S. 224, 229, 26 L. Ed. 1117, 1120; *United States* v. *United States Fidelity & G. Co.,* 236 U. S. 512, 526, 59 L. Ed. 696, 703, 35 Sup. Ct. 298. And the putting out of money at interest is at this day so common a matter that ordinarily it cannot be excluded from consideration in determining the present equivalent of future payments, since a reasonable, man, even from selfish motives, would probably gain some money by way of interest upon the money recovered." *Houston, etc., R. Co.* v. *Willie,* 53 Tex. 318, 37 Am. Rep. 757.

[24] If in estimating the plaintiff's damages they failed also to take into consideration that he was forty-two years of age, and that his earnings from manual labor would naturally diminish because of his advancing years long before he lived out his life expectancy, then they also erred. *Florida, etc., Ry. Co.* v. *Lassiter,* 58 Fla. 247, 50 So. 428, 19 Am. & Eng. Ann. Cas. 196; Shearman & Redfield on Negligence, sec. 760, p. 2009.

This court, in *Southern Ry. Co. v. Smith,* 107 Va. 553, 59 S. E. 372, where the plaintiff was thrown under an engine which crushed and destroyed his arm, allowed a recoverey of $15,000, which so far as we are advised is the largest amount ever recovered in this State for such an injury.

In the Virginia cases, *C. & O. Ry. Co. v. Swartz, supra,* in which this court sustained a verdict for $17,000 for loss of a leg, and *C. & O. Ry. Co. v. Carnahan, supra,* in which a verdict for $25,000 for a similar injury was sustained, there were peculiar circumstances, chiefly the fact that in neither case had the plaintiff, at the time of the trial, recovered from the immediate effects of the injury, but in both these cases they were still suffering from their unhealed wounds. In this case no such peculiar circumstances exist. There is no evidence that the plaintiff's wound has failed to heal, and he is not wholly disabled. Many occupations are still open to him, and while, if entitled to recover, he is entitled to proper compensation, he is not entitled to excessive damages.

In *Norfolk Southern Railroad Co. v. Crocker,* 117 Va. 327, 84 S. E. 681, where a verdict for $18,000 for the loss of a leg was sustained, it appeared that the plaintiff suffered intensely and for a long period, and that his medical and other expenses amounted to $3,000 or more.

As we are of opinion that under the circumstances of this case these damages are excessive, and also that the court erred in refusing to give the defendant's instruction "D," or some equivalent thereof, the judgment will be reversed and the case remanded for a new trial in accordance with the views here expressed.

*Reversed.*